PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2446
_____

JOHN THORPE;
SAC AND FOX NATION OF OKLAHOMA;
WILLIAM THORPE; RICHARD THORPE

v.

BOROUGH OF JIM THORPE; MICHAEL SOFRANKO;
RONALD CONFER; JOHN MCGUIRE; JOSEPH
MARZEN;
W. TODD MASON; JEREMY MELBER; JUSTIN YAICH;
JOSEPH KREBS; GREG STRUBINGER; KYLE
SHECKLER;
JOANNE KLITSCH


Borough of Jim Thorpe,
                              Appellant


_____

No. 13-2451
_____

JOHN THORPE; SAC AND FOX NATION OF
OKLAHOMA;
WILLIAM THORPE; RICHARD THORPE

v.

BOROUGH OF JIM THORPE; MICHAEL SOFRANKO;
RONALD CONFER; JOHN MCGUIRE; JOSEPH
MARZEN;
W. TODD MASON; JEREMY MELBER; JUSTIN YAICH;

JOSEPH KREBS; GREG STRUBINGER; KYLE
SHECKLER;
JOANNE KLITSCH


Sac and Fox Nation of Oklahoma, William Thorpe,
Richard Thorpe,
Appellants

_____


APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE MIDDLE DISTRICT OF
PENNSYLVANIA
(D.C. No. 3-10-cv-01317)
District Judge: Honorable A. Richard Caputo
_____


Argued: February 14, 2014
_____


Before: MCKEE, *Chief Judge*, CHAGARES and
SHWARTZ, *Circuit Judges*

(Filed:  October 23, 2014)
_____

William G. Schwab, Esq. (**ARGUED**)
Vincent R. Garvey, Esq.
William G. Schwab & Associates
811 Blakeslee Boulevard Drive East
P.O. Box 56
Lehighton, PA 18235
        *Counsel for Appellants*

Christopher G. Fusco, Esq. (**ARGUED**)
Callahan & Fusco
103 Eisenhower Parkway, Suite 400
Roseland, NJ 07068
        *Attorney for Cross-Appellees*

Charles L. Riddle, Esq.
Riddle Patent Law, LLC
434 Lackawanna Avenue, Suite 200
Scranton, PA 18503

Stephen R. Ward, Esq. (**ARGUED**)
Daniel E. Gomez, Esq.
Conner & Winters, LLP
One Williams Center
Suite 4000
Tulsa, OK 74172
  *Attorneys for Appellees*

Daniel H. Wheeler, Esq. (**ARGUED**)
610 Montgomery School Lane
Wynnewood, PA 19096
  *Attorney for Amicus Curiae*
  *Michael Koehler and John Thorpe*

Michael Campbell, Esq.
Native American Rights Fund
1506 Broadway
Boulder, CO 80302
  *Attorney for Amicus Curiae*
  *The National Congress of the American Indians*

_____

OPINION
_____

McKEE, *Chief Judge*

## I. INTRODUCTION

Jim Thorpe, multi-sport Olympic gold medalist ("Thorpe"), died in California in 1953 without a will.[1]  His

---

[1] Some commentators still regard Thorpe as "the greatest Olympian of all time." *See* Sally Jenkins, *Greatest Olympic athlete? Jim Thorpe, not Usain Bolt*, WASHINGTON POST, Aug. 10, 2012, http://www.washingtonpost.com/sports/olympics/greatest-

estate was assigned to his third wife, Patricia ("Patsy"),[2] who eventually buried him in what is now Jim Thorpe, Pennsylvania ("the Borough"). Jim Thorpe, Pennsylvania was a newly-formed borough that had been created from the merger of the boroughs of Mauch Chunk and East Mauch Chunk. Thorpe was buried in this new borough over the objections of several children from his previous marriages. Thorpe was a Native American of Sauk heritage and a member of the Sac and Fox Nation of Oklahoma. Over the years, some of Thorpe's eight children have spoken out in protest of their father's burial, advocating that he be reburied on Sac and Fox tribal land in Oklahoma.

In 1990, years after Thorpe's death and burial, Congress enacted the Native American Graves Protection and Repatriation Act ("NAGPRA"). NAGPRA was intended to ameliorate and correct past abuses inflicted upon Native Americans and their culture and to protect Native American human remains and cultural artifacts. NAGPRA requires museums and Federal agencies possessing or controlling holdings or collections of Native American human remains to inventory those remains, notify the affected tribe, and, upon the request of a known lineal descendent of the deceased Native American or of the tribe, return such remains. 25 U.S.C. §§ 3003, 3005.

In 2010, John Thorpe, the son of Thorpe and his second wife Freeda, sued the Borough for failing to comply with NAGPRA.[3] The District Court concluded that the Borough was a "museum" within the meaning of NAGPRA and provisions of that law required the Borough to disinter Thorpe's remains and turn them over to the Sac and Fox tribe as requested by John Thorpe. This appeal followed.

---

olympic-athlete-jim-thorpe-not-usain-bolt/2012/08/10/f9114872-e33c-11e1-ae7f-d2a13e249eb2_story.html.

[2] Patsy Thorpe is deceased. She and Jim Thorpe did not have children together.

[3] John Thorpe was often called Jack Thorpe, both in his life and in this litigation. For clarity, we will refer to him only as John Thorpe.

We conclude that Congress could not have intended the kind of patently absurd result that would follow from a court resolving a family dispute by applying NAGPRA to Thorpe's burial in the Borough under the circumstances here. We therefore hold that the District Court erred in overturning the clearly expressed wishes of Thorpe's wife by ordering his body to be exhumed and his remains delivered to John Thorpe.[4]

## II. FACTS AND PROCEDURAL HISTORY

Thorpe died in California in 1953. Thereafter, Patsy, in cooperation with the Oklahoma legislature, made initial plans for him to be buried in Oklahoma.[5] According to Plaintiffs, Thorpe had told family members that he wanted to be buried in Oklahoma. However, the parties agree that Patsy Thorpe had legal authority over the disposition of Thorpe's body and his estate. In any event, at some point following Thorpe's death, a bill was drafted by the Oklahoma legislature that would have provided funding for a permanent memorial near the contemplated site for Thorpe's grave. However, in what was a harbinger of difficulties to come, the bill was vetoed by the Governor of Oklahoma. This sad and regrettable posthumous saga took an even more ominous turn when Patsy, assisted by state law enforcement officers, intervened in Thorpe's ritual burial ceremony in Oklahoma, and caused Thorpe's casket to be removed and stored. After considering various sites for Thorpe's burial,[6] Patsy arranged

[4] Because we conclude that the Borough is not a "museum" because NAGPRA does not apply here, we do not consider the Borough's argument that the doctrine of laches bars this action.

[5] As we explained at the outset, Patsy is Thorpe's third wife.

[6] Patsy had also considered burying Thorpe in Carlisle, Pennsylvania, where Thorpe played football as a teenager under legendary coach Pop Warner at Carlisle Indian Industrial School. John Luciew, *Town of Jim Thorpe is Ready to Fight for Identity it Adopted 56 Years Ago*, PENNLIVE, Aug. 2, 2010,

to have Thorpe buried at a location in Jim Thorpe, Pennsylvania. That municipality was to be formed by the merger of Mauch Chunk and East Mauch Chunk, and the resulting borough was to be named Jim Thorpe. This agreement was reached despite the objection of several of Thorpe's children.[7] The agreement provided in part that Mauch Chunk and East Mauch Chunk would consolidate under the name "Jim Thorpe" "as a fitting tribute and memorial to the person and memory of the husband of [Patsy Thorpe] and that appropriately correlated to such designation of the name 'Jim Thorpe' the remains of [him] be laid to rest in the community so bearing his name." Appendix ("App.") 486. Patsy Thorpe intended that the Borough would be "the final and permanent resting place" for her husband. *Id.*

After the arrangements were made for the burial site in the Borough, Thorpe was first buried at the Evergreen Cemetery in the Borough while a mausoleum was being constructed for his remains. In 1957, he was interred in what was believed to be his final resting place.[8] The agreement Patsy had reached with the Borough provides that the Borough is responsible for the maintenance at the burial site. However, family members have visited the site over the years and have worked with the Borough to conduct tribal

---

http://www.pennlive.com/midstate/index.ssf/2010/08/town_of _jim_thorpe_is_ready_to.html.

[7] Thorpe's descendents never reached a unanimous agreement about where he should be buried. Charlotte Thorpe, Jim Thorpe's daughter by his first wife Iva, helped Patsy decide on his final burial site in the newly formed borough of Jim Thorpe, Pennsylvania. Appendix ("App.") 413.

[8] At least Patsy and the leaders of the Borough thought this was his final resting place. The Mayor of the Borough testified that he was aware of newspaper articles and speeches in which John Thorpe, one of Thorpe's sons from his second marriage, expressed a desire to move the body, but the Borough was never formally informed of that desire. App. 361-62.

ceremonies. The Jim Thorpe Hall of Fame has also worked to improve the site.

John Thorpe filed the instant Complaint in 2010, alleging that the Borough had failed to comply with NAGPRA.[9] The Borough immediately moved to dismiss the complaint. The District Court dismissed John Thorpe's § 1983 claim but allowed him to proceed under NAGPRA.[10] John Thorpe was also ordered to join all necessary parties in an amended complaint or submit evidence and briefing showing that joinder of any or all of the necessary parties was not feasible and that the action could proceed in "equity and good conscience" under Rule 19(b). App. 171. John Thorpe died the following year and the proceedings were stayed until his attorney filed an amended complaint naming as new plaintiffs John's brothers Richard and William Thorpe, the sons of Jim Thorpe and his second wife Freeda ("Plaintiffs").

Thereafter, the District Court granted Plaintiffs' motion for summary judgment based on its conclusion that "[t]he Borough of Jim Thorpe is a 'museum' under [NAGPRA] and subject to the requirements of the Act, including those provisions governing repatriation requests."

---

[9] Over fifty years passed between Jim Thorpe's death and this challenge to his burial. The Plaintiffs waited for their sister, Grace Thorpe, to die before instituting this action because she did not agree that Thorpe's remains should be removed from the Borough. App. 414. In addition, Plaintiffs did not challenge the disposition of Thorpe's estate in California immediately after his death. App. 390.

[10] 42 U.S.C. § 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

App. 80. The Borough appealed that finding and Plaintiffs appealed the District Court's dismissal of their §1983 claim.[11]

### III. JURISDICTION AND STANDARD OF REVIEW

The District Court had federal question jurisdiction pursuant to 28 U.S.C. § 1331, and we have jurisdiction pursuant to 28 U.S.C. § 1291. NAGPRA's jurisdictional provision vests federal courts with jurisdiction over "any action brought by any person alleging a violation of" NAGPRA. 25 U.S.C. § 3013.[12] This Court exercises plenary review over the District Court's finding of law that NAGPRA applies to Thorpe's burial. *Pell v. E.I. DuPont de Nemours & Co.*, 539 F.3d 292, 305 (3d Cir. 2008).

---

[11] Plaintiffs also sued several individual defendants, who are participating only in the cross-appeal as cross-appellees. Also participating in this appeal as amici are the National Congress of the American Indians, who favor moving Thorpe's remains to Oklahoma, as well as two of Jim Thorpe's grandsons, Michael Koehler and John Thorpe, who oppose repatriation because they believe their grandfather should rest in peace and that their family's burial decision should be respected. They are also concerned that the burial decisions of every Native American family will be jeopardized if the District Court's decision stands. Michael Koehler and John Thorpe are Charlotte Thorpe's children. Charlotte was the daughter of Jim and Iva Thorpe, Thorpe's first wife.

[12] We must also ensure that we have jurisdiction to hear this case, because the "jurisdiction conferred by the Judiciary Act of 1789 . . . did not extend to probate matters." *Markham v. Allen*, 326 U.S. 490, 494 (1946). There are three circumstances in which the probate exception to jurisdiction applies: when the court is working to probate or annul a will, administer a decedent's estate, or assume *in rem* jurisdiction over property that is in the custody of the probate court. *Marshall v. Marshall*, 547 U.S. 293, 311-12 (2006). "[I]t does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction." *Id.* at 312. This case involves the status of Thorpe's remains, not his estate or will, and therefore does not touch upon anything that could be considered a "probate matter."

## IV. HISTORY AND OVERVIEW OF NAGPRA

NAGPRA, 25 U.S.C. §§ 3001-3013, was first enacted in 1990 "as a way to correct past abuses to, and guarantee protection for, the human remains and cultural objects of Native American tribal culture." 173 A.L.R. Fed. 585. It was passed with two main objectives: "first, to protect Native American burial sites and to require excavation of such sites only by permit, and second, to set up a process by which federal agencies and museums holding Native American remains and cultural artifacts will inventory those items and work with tribes to repatriate them." *Kickapoo Traditional Tribe of Tex. v. Chacon*, 46 F. Supp. 2d 644, 649 (W.D. Tex. 1999)(citing H.R. Rep. No. 101-877 (1990), *reprinted in* 1990 U.S.C.C.A.N. 4367, 4367-68 ("H.R. Rep.")); *United States v. Corrow*, 119 F.3d 796, 799-800 (10th Cir. 1997).

The Act was an attempt to respond to the looting and plundering of Native American burial grounds and the theft of cultural artifacts from Native American tribes that continued to pour salt into the many wounds that have been inflicted on Native Americans throughout the history of the United States. As stated in the House Report:

Digging and removing the contents of Native American graves for reasons of profit or curiosity has been common practice. These activities were at their peak during the last century and the early part of this century.

In 1868, the Surgeon General issued an order to all Army field officers to send him Indian skeletons. This was done so that studies could be performed to determine whether the Indian was inferior to the white man due to the size of the Indian's cranium. This action, along with an attitude that accepted the desecration of countless Native American burial sites, resulted in hundreds of thousands Native American human remains and funerary objects being sold or housed in museums and educational institutions around the county.

9

> For many years, Indian tribes have attempted to have the remains and funerary objects of their ancestors returned to them. This effort has touched off an often heated debate on the rights of the Indian versus the importance to museums of the retention of their collections and the scientific value of the items.

H. R. Rep. The scope of the cultural plundering is breathtaking. "National estimates are that between 100,000 and two million deceased Native people have been dug up from their graves for storage or display by government agencies, museums, universities and tourist attractions." Jack F. Trope & Walter R. Echo-Hawk, *The Native American Graves Protection and Repatriation Act: Background and Legislative History*, 24 ARIZ. ST. L.J. 35, 39 (1992).

The movement to pass a law protecting Native American human remains, funerary objects, cultural patrimony and sacred objects originated in a hearing held by the Select Committee on Indian Affairs in 1987. That hearing was for a bill that would provide for the repatriation of Indian artifacts. S. Rep. No. 101-473 (1990) ("S. Rep."). Smithsonian Secretary Robert McCormick Adams testified that of the 34,000 remains in the Institution's collection, approximately 42.5% of the specimens were the remains of North American Indians. "Tribal reaction to Secretary Adams' testimony was swift, and in the months which followed, Indian tribes around the country called for the repatriation of those human remains that could be identified as associated with a specific tribe or region for their permanent disposition in accordance with tribal customs and traditions, and for the proper burial elsewhere of" nonidentifiable remains. *Id.* The proposed bill led to additional hearings, which resulted in establishing a year-long Panel for a National Dialogue on Museum/Native American Relations between museum professionals and Native Americans, designed to develop recommendations to address the necessity of responding to tribal demands for repatriation. The National Museum of the American Indian Act, enacted in 1989, was the precursor to NAGPRA and established such a museum in the Smithsonian. It also included provisions for the treatment and disposition of human remains and sacred

objects, including an inventory process. Pub. L. No. 101-185 (1989).

Legislative efforts to protect Native American remains continued throughout 1989 and 1990. During a hearing of the Select Committee on Indian Affairs, tribal representatives testified that:

> in cases where Native Americans have attempted to regain items that were inappropriately alienated from their tribes, they have met with resistance from museums and have lacked the legal ability of [sic] financial resources to pursue the return of the items. Several witnesses testified that in many instances Indian tribes do not know what types of remains or objects are in the possession of museums and have been unsuccessful in their attempts to obtain access to this information.

S. Rep.

Native American leaders also spoke about the need to provide additional protections to Native American burial sites. They testified that:

> Indian tribes have had many difficulties in preventing the illegal excavation of graves on tribal and Federal lands. Several witnesses testified that there is a flourishing trade in funerary and sacred objects that have been obtained from burials located on tribal and Federal lands. Additional testimony was received from witnesses who indicated that tribal and Federal officials have been unable to prevent the continued looting of Native American graves and the sale of these objects by unscrupulous collectors.

*Id.*

The repatriation procedure proposed was modeled after the National Museum of the American Indian Act, which authorizes the repatriation of human remains and funerary objects from the collections of the Smithsonian Institution. S. Rep. New procedural requirements were a

11

response to testimony by tribal witnesses about "vast numbers of Native American human remains contained in the Smithsonian collections which, according to tribal religious practices, must be given appropriate burials." *Id*.

The first draft of the Native American Repatriation of Cultural Patrimony Act —which eventually became NAGPRA — was modeled after the provisions contained in the National Museum of the American Indian Act. It attempted to "extend the inventory, identification and repatriation provisions [in the National Museum of the American Indian Act] to all Federal agencies and any institution which receives Federal funding." *Id*. This bill, along with a bill introduced by Senator McCain, the Native American Grave and Burial Protection Act, formed the basis of NAGPRA. NAGPRA extended the Museum of the American Indian Act to "Federal agencies and museums receiving Federal funds." *Id*. "NAGPRA's reach in protecting against further desecration of burial sites and restoring countless ancestral remains and cultural and sacred items to their tribal homes warrants its aspirational characterization as 'human rights legislation.'" *United States v. Corrow*, 119 F.3d 796, 800 (10th Cir. 1997) (quoting Trope & Echo-Hawk, *supra*, at 37).

NAGPRA has two parallel procedures, depending on whether the item in question is held by a federal agency or museum or is discovered on federal lands after November 16, 1990, NAGPRA's effective date. *Pueblo of San Ildefonso v. Ridlon*, 103 F.3d 936, 938 (10th Cir. 1996). "First, the Act addresses items excavated on federal lands after November 16, 1990 and enables Native American groups affiliated with those items to claim ownership. *See* 43 C.F.R. § 10.1 (1995); H.R. Rep. No. 101-877. . . . Second, NAGPRA provides for repatriation of cultural items currently held by federal agencies, including federally-funded museums." *Id*.

The procedure for repatriation of human remains under NAGPRA is as follows: "Each Federal agency and each museum which has possession or control over holdings or collections of Native American human remains . . . shall compile an inventory [defined as "a simple itemized list"] of such [holdings or collections of Native American human

remains] and, to the extent possible based on information possessed by such museum or Federal agency, identify the geographical and cultural affiliation of such item." 25 U.S.C. § 3003(a). These are required to be completed in consultation with tribal governments no later than five years after November 16, 1990, and made available to a review committee established under the statute. 25 U.S.C. § 3003(b)(1).

If the cultural affiliation of Native American human remains is established, then "the Federal agency or museum, upon the request of a known lineal descendant of the Native American or of the tribe or organization," shall return the remains. 25 U.S.C. § 3005(a)(1). Where there are multiple requests for repatriation of any cultural item (which includes human remains), and the museum cannot clearly determine which requesting party is the most appropriate claimant, the museum may retain such item until the requesting parties agree upon its disposition or the dispute is otherwise resolved pursuant to the provisions of this chapter or by a court of competent jurisdiction. 25 U.S.C. § 3005(e). Any "museum" that fails to comply with these requirements may be assessed a civil penalty by the Secretary of the Interior. 25 U.S.C. § 3007.

## V. THE BOROUGH IS NOT A "MUSEUM" UNDER NAGPRA[13]

NAGPRA defines the word "museum" very broadly, as:

> any institution or State or local government agency (including any institution of higher learning) that receives Federal funds and has possession of, or control over, Native American cultural items.

25 U.S.C. § 3001(8).[14] The Borough is a local government entity that maintains Jim Thorpe's burial site. The parties

---

[13] Because we find that the statute does not apply to the Borough, we will not consider the Borough's constitutional arguments regarding NAGPRA.

agree that the Borough has "possession of, or control over," Jim Thorpe's remains, and that he is of Native American descent. Thus, the main question before the District Court was whether the Borough "receives federal funds." The District Court found that the Borough was a museum because the record showed that the Borough received federal funds after the enactment of NAGPRA. However, for the following reasons, we find that the Borough is not a "museum" as intended by NAGPRA. It is therefore not required to comply with NAGPRA's procedural requirement of providing an inventory of Thorpe's remains. Similarly, it is not subject to the statute's requirement that his remains be "returned" to Thorpe's descendants for "repatriation" at their request.[15]

Ordinarily, we look to the text of the statute, rather than the legislative history, to interpret a statute or determine legislative intent as an aid to interpretation. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *In re Visteon Corp.*, 612 F.3d 210, 220 (3d Cir. 2010) ("It is for Congress, not the courts, to enact legislation. When courts disregard the language Congress has used in an unambiguous statute, they amend or repeal that which Congress enacted into law."); *First Merchs. Acceptance Corp. v. J.C. Bradford & Co.*, 198 F.3d 394, 402 (3d Cir. 1999). However, this rule of statutory construction is not an inviolable commandment that

_____

[14] "'[C]ultural items means human remains and [associated funerary objects, unassociated funerary objects, sacred objects, and cultural patrimony]." 25 U.S.C. § 3001(3). "Human remains" is not defined in the statute, but is defined in the regulations that correspond to the statute to mean "the physical remains of the body of a person of Native American ancestry." 43 C.F.R. § 10.2(d)(1).

[15] Despite Plaintiffs' characterization of Thorpe's move from the Borough to Oklahoma as a "repatriation" or a "return," the parties all agree that Thorpe was never actually buried in Oklahoma. As we have explained, a ritual burial started there, but was never actually completed. Rather, his wife interrupted the burial and caused his remains to be transferred to Pennsylvania for burial in the Borough.

we must blindly enforce regardless of surrounding circumstances or the practical results of rigidly applying the text to a given situation.  Thus, we have made exceptions in rare cases in which "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *First Merchs.*, 198 F.3d at 402 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).  "In such situations, 'those intentions must be controlling.'" *Id.* As the Supreme Court has explained, "[s]tatutory interpretations 'which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Id.* (quoting *Griffin*, 458 U.S. at 575).  "But only absurd results and 'the most extraordinary showing of contrary intentions' justify a limitation on the 'plain meaning' of the statutory language." *Id*. (quoting *Garcia*, 469 U.S. 70, 75 (1984)); *see also United States v. Terlingo*, 327 F.3d 216, 221 (3d Cir. 2003) (noting that courts may look behind a statute only when the plain meaning produces "a result that is not just unwise but is clearly absurd") (internal quotation marks omitted).

Furthermore, "a reviewing court should not confine itself to examining a particular statutory provision in isolation.  Rather, [t]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) (internal citation and quotation marks omitted).  "A court must . . .  interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citation and internal quotation marks omitted).  Accordingly, the Supreme Court has concluded that  "[a]n inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent." *Burns v. United States*, 501 U.S. 129, 136 (1991), *abrogated on other grounds by Booker v. United States*, 543 U.S. 220 (2005).

We conclude that we are confronted with the unusual situation in which literal application of NAGPRA "will produce a result demonstrably at odds with the intentions of its drafters." *Griffin*, 458 U.S. at 571.  We must therefore

look beyond the text of NAGPRA to identify the intentions of the drafters of the statute, and that intent "must . . . control[] [our analysis.]" *Id.*

As we have explained, NAGPRA requires "repatriation" of human remains from "museums," where those remains have been collected and studied for archeological or historical purposes. 25 U.S.C. § 3005. It is clear from the legislative history we have recounted above that Congress was also concerned with returning to Native American tribes the human remains and artifacts that had been taken for profit, gain, exploitation, or rank curiosity without regard to the concerns of the Native American tribe whose legitimate and paramount interest should have been recognized. However, the definition of "museum" in the text of NAGPRA sweeps much wider than that. If interpreted literally, it would include any state or local governmental entity that "has possession of, or control over, Native American cultural items[]" regardless of the circumstances surrounding the possession. This could include any items given freely by a member of the tribe. Here, it would include human remains buried in accordance with the wishes of the decedent's next-of-kin. Literal application would even reach situations where the remains of a Native American were disposed of in a manner consistent with the deceased's wishes as appropriately memorialized in a testamentary instrument or communicated to his or her family. There is therefore no limitation that would preserve the final wishes of a given Native American or exempt determination of his or her final resting place from the procedural requirements of NAGPRA.[16]

---

[16] NAGPRA defines a museum's legitimate right of possession to include human remains that were freely given by the decedent's next-of-kin. 25 U.S.C. § 3001(13) ("The original acquisition of Native American human remains and associated funerary objects which were excavated, exhumed, or otherwise obtained with full knowledge and consent of the next of kin . . . is deemed to give right of possession to those remains.").

The statute does not explain the legal effect of this definition. NAGPRA provides that a museum may keep certain items requested by a descendent or tribe if the

"We have reserved some scope for adopting a restricted rather than a literal or usual meaning of [a statute's] words where acceptance of that meaning would thwart the obvious purpose of the statute."  *Griffin*, 458 U.S. at 571 (internal quotations, ellipsis and citation omitted).  Here, it is clear that the congressional intent to regulate institutions such as museums and to remedy the historical atrocities inflicted on Native Americans, including plundering of their graves, is not advanced by interpreting "museum" to include a gravesite that Thorpe's widow intended as Thorpe's final resting place.  As we stated earlier, Plaintiffs do not maintain that Patsy was without authority to determine where Thorpe was to be buried.  Moreover, as also explained above, the record is clear that Plaintiffs delayed bringing this suit until certain of Thorpe's survivors who favored his burial in the Borough died.

As stated in the House Report, "[t]he purpose of [NAGPRA] is to protect Native American burial sites and the *removal* of human remains."  H. R. Rep. (emphasis added).  NAGPRA was intended as a shield against further injustices to Native Americans.  It was not intended to be wielded as a sword to settle familial disputes within Native American families.  Yet, that is what we would allow if we were to enforce NAGPRA's repatriation provisions as written here.

Aside from the unusual arrangements between Patsy Thorpe and the Borough, and Plaintiffs' understandable desire to move Thorpe's remains to where they prefer for him to be buried,[17] his burial in the Borough is no different than

museum "prove[s] that it has a right of possession to the objects." 25 U.S.C. § 3005(c).  However, this section by its terms does not apply to human remains, and instead only applies to "unassociated funerary objects, sacred objects or objects of cultural patrimony[.]" *Id.*  Even if this section was interpreted to apply to human remains, however, it is not clear that a museum with a right of possession over those remains would be exempt from the procedural and inventory requirements of NAGPRA.

[17] Nothing we have said prevents Plaintiffs from seeking reinterment via an action in Pennsylvania state court.

any other burial, except that he is a legendary figure of Native American descent. If we were to find that NAGPRA applies to Thorpe's burial, we would also have to conclude that it applies to any grave located in "any institution or State or local government agency . . . that receives federal funds and has possession of, or control over, Native American cultural items." This could call into question any "institution" or "State or local government agency" that controls a cemetery or grave site where Native Americans are buried, and would give rights to any lineal descendant or tribe that has a claim to a person buried in such a cemetery. The Amicus brief on behalf of Thorpe's grandsons, Michael Koehler and John Thorpe, makes this clear:

> Imagine a scenario where a deceased person is buried by his widow at the site of her choosing. But after the widow dies, the next generation – or even complete strangers in the case of a tribe – decides to dig up the body with court approval and move it somewhere else for any reason they desire. They aren't even required to bury the remains. This is not a "parade of horribles" conjured up by the Thorpe grandsons. That is their reality. If the district court's decision is allowed to stand, this scenario can repeat for funerals past and future as long as the deceased has any Native American ancestry.

Amicus Br. for Koehler and Thorpe, at 5. Accordingly, "based solely on the language and context of the most relevant statutory provisions, the court cannot say that Congress's intent is so clear and unambiguous that it

---

However, "once a body is interred there is great reluctance in permitting same to be moved, absent clear and compelling reasons for such a move." *Novelli v. Carroll*, 420 A.2d 469, 476 (Pa. Super. Ct. 1980) (Watkins, J., dissenting) (citing *Stevens v. Ganz*, 49 Pa. D. & C.2d 283, 286 (1970)); *see also Pettigrew v. Pettigrew*, 56 A. 878, 880 (Pa. 1904) ("With regard to a reinterment in a different place, the same rules should apply, but with a presumption against removal growing stronger with the remoteness of connection with the decedent, and reserving always the right of the court to require reasonable cause to be shown for it.").

'foreclose[s] any other interpretation.'"  *King v. Burwell*, 759 F.3d 358, 369 (4th Cir. 2014) (quoting *Grapevine Imports, Ltd. v. United States*, 636 F.3d 1367, 1377 (Fed. Cir. 2011)).

There are numerous indications that Congress did not intend for NAGPRA to apply to this situation.  The Senate Report explains that the statute was designed to "provide additional protections to Native American burial sites. Indian tribes have had many difficulties in preventing the illegal excavation of graves on tribal and Federal lands [, and] tribal and Federal officials have been unable to prevent the continued looting of Native American graves and the sale of these objects by unscrupulous collectors."  S. Rep.  The Amicus brief submitted by the National Congress of the American Indians in support of Plaintiffs summarized the Antiquities Act of 1906.  That Act defined Native American remains on federal lands as "archeological resources[.]" Amicus Br. of Nat'l Cong. of the Am. Indians, at 6.  The collateral consequence was the disinterment of many remains for preservation in museums. The amici also refer to the Archaeological Resources Protection Act of 1979.  That statute also deemed Native American remains on federal lands "archaeological resources" and permitted those remains to be disinterred. *Id.* at 6-7. This was in "sharp contrast to the legal treatment of non-Indian burials and remains, which were generally protected from looting and disturbance.  NAGPRA was needed to ensure *equal treatment* of Native American remains."  *Id.* (emphasis added).  With this objective, "Congress sought to repatriate human remains and other objects by ensuring human remains . . . are returned." *Id.* at 10.

Our conclusion that Congress did not intend the result required by a literal application of the text of NAGPRA is reinforced by examining multiple sections of the statute.  For example, as noted earlier, § 3001(13) defines "right of possession" to include human remains freely given by the deceased or the deceased's next of kin. This definition is further evidence of Congress's intent to exclude situations such as Thorpe's burial in the Borough.  Our conclusion is also consistent with the inventory requirement.  Section 3003 applies to a "museum which has possession or control over *holdings or collections of Native American human*

*remains*[.]" This implies that the statute assumes that a museum is holding or collecting the remains for the purposes of display or study, as opposed to serving as an original burial site. Finally, NAGPRA requires that remains be "returned." 25 U. S. C. § 3005. This assumes that the human remains were moved from their intended final resting place. Thorpe was buried in the Borough by his wife, and she had the legal authority to decide where he would be buried. Thus, there is nowhere for Thorpe to be "returned" to. As the House Report explains: "[f]or many years, Indian tribes have attempted to have the remains and funerary objects of their ancestors *returned* to them." H.R. Rep. (emphasis added).

Thorpe's remains are located at their final resting place and have not been disturbed. We find that applying NAGPRA to Thorpe's burial in the Borough is such a clearly absurd result and so contrary to Congress's intent to protect Native American burial sites that the Borough cannot be held to the requirements imposed on a museum under these circumstances. We reverse the District Court and hold that the Borough is not a "museum" under NAGPRA for the purposes of Thorpe's burial.[18]

## V. CONCLUSION

For the foregoing reasons, we will reverse the judgment of the District Court as to the applicability of NAGPRA to the burial of Jim Thorpe in the Borough, and affirm the District Court's dismissal of Plaintiffs' § 1983 claim. We will remand the action for the District Court to enter judgment in favor of Appellant, the Borough of Jim Thorpe.

---

[18] In the cross-appeal, the Plaintiffs challenge the District Court's finding that they cannot obtain relief for a violation of NAGPRA under 42 U.S.C. § 1983. In light of our finding that NAGPRA is not applicable to Thorpe's burial in the Borough, Plaintiffs cannot sustain a claim for a violation of NAGPRA under either that statute or § 1983. Therefore we will affirm the District Court's dismissal of Plaintiffs' § 1983 claim.