**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-2081**

---

WINNEBAGO TRIBE OF NEBRASKA,

        Plaintiff – Appellant,

   v.

UNITED STATES DEPARTMENT OF THE ARMY; DANIEL DRISCOLL, in his official capacity as Acting Secretary of the Army; UNITED STATES DEPARTMENT OF THE ARMY, OFFICE OF ARMY CEMETERIES; KAREN DURHAM-AGUILERA, in their official capacity as Executive Director of the Office of Army Cemeteries; RENEA C. YATES, in their official capacity as Director of the Office of Army Cemeteries; TORSTEN GOJOWSKY, Lieutenant Colonel, in their official capacity as Garrison Commander of the United States Army Carlisle Barracks,

        Defendants – Appellees.

---

UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND; NATIONAL ASSOCIATION OF TRIBAL HISTORIC PRESERVATION OFFICERS; ASSOCIATION ON AMERICAN INDIAN AFFAIRS; CATAWBA NATION; GREAT PLAINS TRIBAL LEADERS HEALTH BOARD; SISSETON WAHPETON OYATE; SPIRIT LAKE TRIBE,

        Amici Supporting Appellant.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Claude M. Hilton, Senior District Judge.  (1:24-cv-00078-CMH-IDD)

---

Argued:  September 10, 2025                 Decided:  May 14, 2026

Before HARRIS and RUSHING, Circuit Judges, and FLOYD, Senior Circuit Judge.

---

Vacated and remanded by published opinion. Judge Harris wrote the opinion, in which Judge Floyd joined. Judge Rushing wrote a dissenting opinion.

---

**ARGUED:** Beth Margaret Wright, NATIVE AMERICAN RIGHTS FUND, Boulder, Colorado, for Appellant. Tamara N. Rountree, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Jason Searle, NATIVE AMERICAN RIGHTS FUND, Boulder, Colorado; Danelle J. Smith, BIG FIRE LAW & POLICY GROUP LLP, Winnebago, Nebraska; Wesley James Furlong, NATIVE AMERICAN RIGHTS FUND, Anchorage, Alaska; Gregory Alan Werkheiser, Jessie Barrington, CULTURAL HERITAGE PARTNERS, PLLC, Richmond, Virginia, for Appellant. Adam R.J. Gustafson, Acting Assistant Attorney General, Thekla Hansen-Young, Environment and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. Dale W. Pittman, THE LAW OFFICE OF DALE W. PITTMAN, PC, Petersburg, Virginia; Kaitlyn E. Klass, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, Washington, D.C.; Lydia Locklear, CATAWBA NATION, Rock Hill, South Carolina, for Amici United South and Eastern Tribes Sovereignty Protection Fund, National Association of Tribal Historic Preservation Officers, Association on American Indian Affairs, and Catawba Nation. Frank S. Holleman, IV, Washington, D.C., Colin Cloud Hampson, Cassidy R. Guerro, SONOSKY, CHAMBERS, SACHSE, ENDRESON & PERRY, LLP, Bonita, California; Leroy V. LaPlante, Jr., Director of Legal Affairs & General Counsel, GREAT PLAINS TRIBAL LEADERS HEALTH BOARD, Rapid City, South Dakota, for Amicus Great Plains Tribal Leaders Health Board. Megan LaFromboise, SISSETON WAHPETON OYATE, Agency Village, South Dakota; Steven J. Alagna, Supervising Attorney, Andrew R. Hilty, MacKenzie Y. Palmer, Appellate Clinic, WASHINGTON UNIVERSITY SCHOOL OF LAW, St. Louis, Missouri, for Amici Sisseton Wahpeton Oyate and Spirit Lake Tribe.

---

2

PAMELA HARRIS, Circuit Judge:

In the late 1800s, two children of the Winnebago Tribe of Nebraska were removed from their homes and placed in a federal Indian boarding school on a United States Army base. The boys died at the school, allegedly as a result of abusive conditions, and were buried on site without the consent of their families and in contravention of their tribal and religious traditions. The Tribe now seeks the return of the boys' remains so that they may be properly honored and reburied. In this suit, it has invoked the Native American Graves Protection and Repatriation Act, enacted in 1990 to facilitate repatriation of Native American human remains in the possession or control of federal agencies and federally funded museums.

The district court dismissed the Tribe's action for failure to state a claim, concluding that the Act requires repatriation only of previously excavated remains and not of remains buried in cemeteries. We disagree. As alleged in the Tribe's complaint, the boys' buried remains are subject to the Act's repatriation obligation as part of a "holding or collection" under the Army's control. We therefore vacate the judgment of the district court and remand for further proceedings.

## I.

This case is our court's first encounter with the Native American Graves Protection and Repatriation Act ("NAGPRA" or "the Act"), 25 U.S.C. § 3001 *et seq*. For context, we begin by describing the NAGPRA provisions most relevant here. We turn then to the Tribe's allegations and to the district court decision dismissing the Tribe's action.

3

## A.

NAGPRA was enacted in 1990 "to provide for the protection of Native American graves and the repatriation of Native American remains and cultural patrimony." S. Rep. No. 101-473, at 1 (1990); *see* Pub. L. No. 101-601, 104 Stat. 3048 (1990). To put an end to the centuries-long scourge of "looting and plundering of Native American burial grounds," the Act protected those burial grounds – along with the remains and items buried there pursuant to tribal tradition – from excavation. *Thorpe v. Borough of Thorpe*, 770 F.3d 255, 260 (3d Cir. 2014). The Act also sought to remedy a history of federal exploitation of Native American remains and artifacts. *See id.* (describing "cultural plundering" of "breathtaking" scope). To that end, the Act facilitated the repatriation of remains and funerary objects held by federal agencies and museums without consent or proper ceremony. *Id.* at 260–61.

The Act's repatriation requirement is at the heart of this case. Section 3005 of NAGPRA provides broadly for repatriation of Native American human remains and associated objects that are "possessed or controlled" by federal agencies and federally funded museums. 25 U.S.C. § 3005(a); *see id.* § 3001(8) (defining "museum"). With respect to human remains, there are two different routes to repatriation. In some cases, the "cultural affiliation" of human remains – that is, the remains' relationship to a tribe, *see id.* § 3001(2) (defining "cultural affiliation") – will have been established by an "inventory" prepared by a federal agency or museum under § 3003 of NAGPRA. In those cases, the remains must be returned "expeditiously" upon the request of a lineal descendant of the deceased or the culturally affiliated tribe. *Id.* § 3005(a)(1). But where cultural affiliation

4

has *not* been "established in an inventory prepared pursuant to section 3003" or where the remains are "not included upon any such inventory," then the remains must be returned only if the requesting tribe "can show cultural affiliation by a preponderance of the evidence." *Id.* § 3005(a)(4).

Because § 3005's repatriation requirement refers to the "inventories" prepared under § 3003, that latter provision, too, is central to our case. Section 3005, as noted above, applies by its terms to all Native American human remains "possessed or controlled" by federal agencies and federally funded museums. 25 U.S.C. § 3005(a). Section 3003, by contrast, applies to federal agencies and museums that have "possession or control" over "*holdings or collections*" of Native American remains and associated funerary objects. *Id.* § 3003(a) (emphasis added). Those agencies and museums must compile an inventory of such items and, to the extent possible, identify their cultural affiliations. *Id.* Section 3003 thus facilitates NAGPRA's repatriation goal, putting the burden on agencies and museums to establish the cultural affiliation of remains within their "holdings or collections" so that tribes or descendants can more readily recover them under § 3005(a)(1).

Also relevant to this case, though less directly, are NAGPRA provisions regarding the ownership of and right to possess Native American remains and other cultural items. Under the Act, lineal descendants or tribes are given ownership or control over Native American remains excavated or discovered on federal or tribal land after the date of NAGPRA's enactment in 1990. *Id.* § 3002(a); *see id.* § 3001(3) (defining "cultural items," which include human remains). Trafficking in Native American remains "without the right of possession to those remains" is criminally prohibited. 18 U.S.C. § 1170(a). And for

5

purposes of that provision and others, NAGPRA defines "right of possession" as "possession obtained with the voluntary consent of an individual or group that had authority of alienation." 25 U.S.C. § 3001(13).

**B.**

This case arises from a shameful injustice: the deaths, more than 125 years ago, of Samuel Gilbert and Edward Hensley, two Winnebago boys forcibly removed from their homes by the United States government and enrolled in the Carlisle Indian Industrial School.[1] The Carlisle School, located on an Army base in Carlisle, Pennsylvania, was one of more than 400 Indian "boarding schools" established in the late 1800s and early 1900s by the federal government. *Haaland v. Brackeen*, 599 U.S. 255, 298–99 (2023) (Gorsuch, J., concurring). By way of those schools, the government "remove[d] children to places far from their communities, families, and Indian Tribes with the goal of 'destroying tribal identity and assimilating Indians into broader society.'" J.A. 20 (quoting *Brackeen*, 599 U.S. at 298 (Gorsuch, J., concurring)). Native children were often taken from their homes and enrolled in these schools without their parents' consent. *See Brackeen*, 599 U.S. at 299–300 (Gorsuch, J., concurring). Many, like Samuel and Edward, died while attending these schools. Indeed, the government closed the Carlisle School in 1918

---

[1] Because this case comes to us on a motion to dismiss, we accept as true the well-pled allegations in the Tribe's complaint. We note, however, that the government does not dispute the basic outlines of this reprehensible episode of our history. *See* Federal Appellees' Response Brief at 5–6 (describing the "forced assimilation" of Native American children and boarding school conditions that "were often extremely harsh, abusive, and lacking in adequate care").

"because of the high death rate of Indian students" and "evidence of rampant physical abuse." J.A. 24.

Samuel died within months of his arrival at the Carlisle School, in 1895; Edward died a few years later, in 1899. Both were buried at the Carlisle Indian burial ground, an on-site cemetery described by an Army-commissioned report as "a repository for the remains of Indian School students." J.A. 50 (quoting Hugh Matternes, Matthew Rector & J. W. Joseph, *Archival Research of the Carlisle Indian School Cemetery* 32 (July 5, 2017)). There are no records indicating that Carlisle officials were given consent for the boys' burials – or indeed, that they even informed Edward's or Samuel's families, or the Winnebago Tribe, of the boys' deaths. Nor is there any indication that the boys' burials were accompanied by traditional tribal ceremonies. The school's burial ground was allowed to fall into a state of "disrepair," with gravesite markers rotted away. J.A. 24.

About three decades later, the Army moved some of the remains in the school's burial ground to the Carlisle Barracks Post Cemetery ("Carlisle Cemetery"), an Army cemetery on the Carlisle base. The move was undertaken and the remains disturbed in order to make room for an expansion of the Army base. The remains of the Native American students were "removed haphazardly," with "coffins crumbl[ing] when handled," and then "random[ly]" placed in the Carlisle Cemetery. J.A. 25. A gravestone at Carlisle Cemetery marks Edward's remains, though it misspells the name of his tribe as "Winnebaloo." *Id.* Another marks Samuel's remains, spelling Winnebago instead as "Winnchaga." J.A. 26.

7

Today, a plaque displayed at Carlisle Cemetery reads in part, "Buried here are the Indians who died while attending the Carlisle Indian School (1879-1918)." J.A. 106. Another, erected outside the cemetery by the Pennsylvania Historical and Museum Commission, "informs passers-by of the history of the Carlisle Indian Industrial School and its intention to assimilate American Indians into mainstream culture." J.A. 50 (internal quotation marks omitted). The Army also maintains a webpage for Carlisle Cemetery, which states that the cemetery, "[s]mall, orderly, and historical," "offers visitors a glimpse into the unique past of the United States and Native American history." *Id.* (quoting *Carlisle Barracks Main Post Cemetery: Cemetery Overview*, Office of Army Cemeteries, https://perma.cc/7FZB-8M8W). The Army's public tours of the Carlisle Barracks include discussion of the Indian boarding school and a stop at Carlisle Cemetery and its plaques.

## C.

This case began in October 2023, when the Tribe wrote the government requesting that the Army repatriate the remains of Samuel and Edward pursuant to NAGPRA. An Army official responded, explaining that repatriation was not available under NAGPRA because "graves located within the Carlisle Barracks Post Cemetery do not constitute 'holdings or collections' of the Army," J.A. 93 (quoting 25 U.S.C. § 3003(a)), and that the Army is not required by NAGPRA "to engage in the intentional excavation or exhumation of a grave," *id.*[2] The Tribe then sued in federal district court to enforce NAGPRA's

---

[2] The Army's letter suggested that the boys' remains could be returned pursuant to Army Regulation 290-5, which allows for disinterment of remains at Army cemeteries by request to the Office of Army Cemeteries. AR 290-5 ¶ 3-7 (2020). But the Army's

8

repatriation obligation against the Army, the Office of Army Cemeteries, and four Army officials (collectively, "the Army" or "the government"). *See* 25 U.S.C. § 3013 (allowing for suits in federal court to enforce NAGPRA).

The government moved to dismiss the Tribe's complaint for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). Echoing the Army's letter, the government argued that NAGPRA § 3005's repatriation obligation applies only to those remains subject to § 3003's inventory requirement – that is, to remains that are not only "possessed or controlled" by a federal agency as set out in § 3005, but also part of an agency "holding[] or collection[]" under § 3003. And a cemetery, the government contended, is not a "holding or collection" within the meaning of § 3003. It followed, the government finished, that NAGPRA did not require the Army to return the remains of Edward and Samuel to their tribe so that the boys could receive a proper tribal burial.

The district court agreed and dismissed the case. *Winnebago Tribe of Neb. v. Dep't of Army*, 2024 WL 3884194 (E.D. Va. Aug. 20, 2024). First, the district court, like the government, concluded that § 3005(a)(4) – providing for repatriation when a tribe can show cultural affiliation – applies only to human remains that are subject to § 3003's inventory requirement for "holdings or collections." *Id.* at *2. Subsection (a)(1) of § 3005,

---

guidance on AR 290-5, attached to the Tribe's complaint, makes clear that only the "closest living relative of the decedent," and not the decedent's tribe, may request disinterment. J.A. 95. And according to the Tribe, Samuel and Edward had no direct descendants and the Tribe cannot identify their closest living relatives. We take as true these well-pleaded allegations, which indicate, contrary to the suggestion of our dissenting colleague, that the Tribe cannot recover the remains of Edward and Samuel through the Army's process and must rely solely on NAGPRA repatriation.

9

the court reasoned, addresses repatriation when a § 3003 inventory establishes cultural affiliation, and against that backdrop, it is clear that subsection (a)(4) – which itself references items "not included upon [a § 3003] inventory" – also concerns remains and funerary objects subject to § 3003 as part of a "holding or collection." *Id.*

Then, the court rejected the Tribe's alternative argument: that even if § 3005 applies only to remains in a "holding or collection," the Carlisle Cemetery constitutes such a holding or collection. *Id.* at *2–3. Relying primarily on dictionary definitions, the court reasoned that the words "holding" and "collection" "apply naturally to a museum or federal agency's inventory of previously excavated remains," but not to "graves in a cemetery." *Id.* at *2. Without discussion, the court found that this understanding also comported with the Department of the Interior's regulatory definition of the phrase. *Id.* at *2 & n.1 (citing 43 C.F.R. § 10.2). Finally, the district court, noting the absence of Fourth Circuit precedent, relied on the Third Circuit's decision in *Thorpe*, acknowledging that it addressed a different question but finding persuasive its concern that applying NAGPRA to order disinterment of remains "would run contrary to Congress's intent to protect Native American burial sites." *Id.* at *3.

The Tribe timely appealed.

## II.

We review de novo a district court's grant of a motion to dismiss for failure to state a claim. *Benjamin v. Sparks*, 986 F.3d 332, 351 (4th Cir. 2021). On that review, we "construe facts in the light most favorable to the plaintiff and draw all reasonable inferences

10

in [the plaintiff's] favor." *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (internal quotation marks omitted). We also review de novo questions of statutory interpretation. *Stone v. Instrumentation Lab'y Co.*, 591 F.3d 239, 243 (4th Cir. 2009).

As before the district court, the Tribe makes two arguments on appeal. First, it argues that § 3005's repatriation requirement extends – as per its straightforward title – to *all* Native American remains "possessed or controlled" by federal agencies, whether or not the remains are part of a "holding or collection" subject to § 3003's inventory requirement. *See* 25 U.S.C. § 3005(a) ("Repatriation of Native American human remains and objects possessed or controlled by Federal agencies and museums"). Human remains that are "not included upon any [§ 3003] inventory," *id.* § 3005(a)(4), because they fall outside such a "holding or collection," the Tribe says, are still subject to repatriation under the plain text of § 3005(a)(4) so long as a tribe can establish cultural affiliation. But second, the Tribe argues, even if § 3005(a)(4) applies only to remains that are part of a "holding or collection" under § 3003, the remains of Samuel and Edward, buried with other Native American students at the Carlisle Cemetery, so qualify.

To survive the government's motion to dismiss, the Tribe need prevail on only one of these arguments. Because we agree with the Tribe's second argument and conclude that the remains in question are part of a "holding or collection" within the meaning of NAGPRA, we need not decide whether § 3005(a)(4) also applies to remains that fall outside that category.

11

Before explaining our reasoning, we acknowledge that this case requires us to wade into uncharted waters. As noted earlier, we have never before decided a case arising under NAGPRA, and only one other circuit court has addressed the statute's repatriation obligation in any detail. *See Thorpe*, 770 F.3d at 260–67; *see also Winnebago Tribe*, 2024 WL 3884194, at *3 (noting lack of Fourth Circuit precedent and discussing *Thorpe*). Although we disagree with part of the district court's analysis, we appreciate that court's cogent handling of a challenging statutory scheme.

## A.

The question we address is whether Samuel's and Edward's remains, interred at Carlisle Cemetery as alleged by the Tribe, are part of a "holding or collection" within the meaning of NAGPRA. We begin with the "plain language" of the statute and the ordinary meaning of the phrase "holding or collection." *DIRECTV Inc. v. Nicholas*, 403 F.3d 223, 225 (4th Cir. 2005). Here, the Tribe and the government, along with the district court, have focused on contemporaneous dictionary definitions, which courts often use to illuminate "the ordinary public meaning of [a statute's] terms at the time of its enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020); *see Davidson v. United Auto Credit Corp.*, 65 F.4th 124, 129 (4th Cir. 2023). We follow suit, and conclude that those dictionary definitions support the Tribe's claim.

Dictionaries define "holding" broadly, often equating the term with "property" of various forms, and extending it to reach to "[t]hat which is held" and "something that holds," as well. *See Winnebago Tribe*, 2024 WL 3884194, at *2 (quoting dictionary definition of "holding" as "property (such as land or securities) owned"); *Holding*, Oxford

12

English Dictionary 302–03 (2d ed. 1989); *Holding*, Webster's Ninth New Collegiate Dictionary 575 (1988).[3]  Meanwhile, a "collection" is defined as "[a] number of objects collected or gathered together, viewed as a whole," "a group of things collected and arranged," and "an accumulation of objects gathered for study, comparison, or exhibition." *Collection*, Oxford English Dictionary 478 (2d ed. 1989); *Collection*, Webster's Ninth New Collegiate Dictionary 259 (1988).  On their face, at least, these definitions would seem to cover human remains "held" by a federal agency and "collected and arranged" in a cemetery.  Likewise, a cemetery that serves, in the Army report's own words, as "a repository for the remains of Indian School students," J.A. 50, would seem to qualify as "something that holds."

Dictionary definitions, of course, are not the whole story.  In particular, statutory context may shed light on the meaning of a term, indicating that Congress incorporated something other than its ordinary or dictionary definition.  *Lovo v. Miller*, 107 F.4th 199, 207 (4th Cir. 2024).  And here, the government suggests that the relevant statutory context points toward a narrower definition of "holdings or collections" that reaches only items obtained through an "intentional, affirmative act."  On this much, we agree:  A "holding or collection," in the context of this statute, must refer to something intentionally or purposefully accumulated.  Otherwise, the word "holding," in particular, would encompass

---

[3] It may seem insensitive to refer to human remains in these property-based terms. But as the Tribe explains, NAGPRA itself includes "human remains" in its list of "cultural items," along with "funerary objects," "sacred objects," and "cultural patrimony."  25 U.S.C. § 3001(3); *see also id.* § 3002(a) (establishing criteria for determining "*ownership* or control of Native American cultural items" (emphasis added)).

13

almost anything in a federal agency's possession or control. And that cannot be right, because then the phrase "holdings or collections" would do no work independent of "possession or control," with which it is paired in § 3003(a). *See* 25 U.S.C. § 3003(a) (imposing inventory requirement on federal agencies and museums that have "possession or control over holdings or collections" of Native American remains); *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (in construing statutes, courts "must give effect, if possible, to every clause and word of a statute" (internal quotation marks omitted)). What "holdings or collections" adds to the statutory phrase "possession or control" is the concept of purpose, excluding property – say, human remains buried on an agency's land but unbeknownst to the agency – that is "possessed" or "controlled" without intent or knowledge.[4] But that refinement does not help the government here, because the Tribe alleges (and there really is no dispute) that the Army purposefully – in the government's words, "intentionally and affirmatively" – gathered the remains of Native American students to be held in the Carlisle Cemetery.

The district court narrowed the definition of "holding or collection" in a different way, reading that term as applying "naturally" only to human remains already excavated,

---

[4] Reading "holdings or collections" as limited to property purposefully accumulated or held also accords with NAGPRA's purpose. NAGPRA is centrally concerned with the long history of expropriation and otherwise unethical accumulation and trade of Native American human remains. *See* Jack F. Trope & Walter R. Echo-Hawk, *The Native American Graves Protection and Repatriation Act: Background and Legislative History*, 24 Ariz. St. L.J. 35, 39–42 (1992); *Thorpe*, 770 F.3d at 260–61. Given that focus, it makes sense that Congress aimed NAGPRA's requirements at remains and other objects that agencies and museums had purposefully obtained or accumulated, rather than property accidentally or unknowingly in their possession or control.

14

and not to human remains in a cemetery. *Winnebago Tribe*, 2024 WL 3884194, at \*2. But when it comes to the statutory text, at least, we see no warrant for that distinction. The ordinary meaning of "holding or collection" is not location-specific – imagine, say, a set of rare coins buried in a backyard – and nothing in either § 3003 or § 3005 of NAGPRA excludes interred human remains from the obligations it imposes or otherwise turns on precise physical location. If Congress had wanted to excise interred remains from the scope of § 3003 and § 3005, it could have done so by terms. *See Vanda Pharms., Inc. v. Ctrs. for Medicare & Medicaid Servs.*, 98 F.4th 483, 495 (4th Cir. 2024).

Here again, the government relies less on text and more on context. A different provision of NAGPRA, the government explains – the "ownership" provision at § 3002 – already covers human remains that are still buried, imposing distinct obligations on those who discover or excavate such remains. *See* 25 U.S.C. § 3002. If NAGPRA's repatriation provision also extended to such remains, the government argues, it would make no sense for Congress to have covered them separately in § 3002. But we see nothing redundant or odd about these paired provisions. Section 3002, as described earlier, assigns "ownership or control" of human remains "excavated or discovered" after the date of NAGPRA's enactment to a lineal descendant or tribe. *Id.* So under the reading we adopt today, § 3005 may require an agency or museum to excavate human remains still buried on its land in order to repatriate the remains to a lineal descendant or tribe, and § 3002 will confer on that same lineal descendant or tribe ownership or control over the remains once they are discovered or excavated – just as it would if the remains were discovered or excavated not by a repatriating agency but by a hobbyist or thief. To our eye, the provisions achieve

15

complementary, if partially overlapping, purposes, and provide no warrant for departing from the ordinary meaning of "holding or collection."

The district court also relied on the Department of the Interior's regulatory definition of "holding or collection," finding that it was consistent with a reading of "holding or collection" limited to human remains already excavated. *Winnebago Tribe*, 2024 WL 3884194, at *2 & n.1.  The district court did not explain its thinking on this point, and with respect, it is not entirely clear to us.  The regulatory definition is exceedingly broad, defining "holding or collection" as "an accumulation of one or more objects, items, or human remains for *any* temporary or permanent purpose, including" a list of 15 examples such as "conservation," "education," "exhibition," "preservation," "public benefit," "scientific interest," and "study."  43 C.F.R. § 10.2 (emphasis added).[5]  As we have discussed already, we agree that a "holding or collection," as used in NAGPRA, refers to property obtained or accumulated for *some* purpose, which this definition reflects.  But it is clear from the face of § 10.2 that *any* purpose will do – including the laying to rest of human remains in a cemetery.

---

[5] The full text of the regulation reads as follows:

Holding or collection means an accumulation of one or more objects, items, or human remains for any temporary or permanent purpose, including: (1) Academic interest; (2) Accession; (3) Catalog; (4) Comparison; (5) Conservation; (6) Education; (7) Examination; (8) Exhibition; (9) Forensic purposes; (10) Interpretation; (11) Preservation; (12) Public benefit; (13) Research; (14) Scientific interest; or (15) Study.

43 C.F.R. § 10.2.

The government reads the regulation differently – but only by reading out of it its plain text. According to the government, § 10.2 defines "holding or collection" as "'an accumulation' of human remains for *specific* purposes." Federal Appellees' Response Brief at 33 (emphasis added). But where the government uses "specific," the regulation uses "any" – making clear that the list that follows is non-exhaustive. And while the government insists that the "specific" purpose must be something like "study, comparison, or exhibition," *id.*, the list itself ranges far more widely. It includes purposes like "preservation," "catalog," and a catch-all "public benefit" that differ significantly from those the government highlights and might reasonably apply to a holding of human remains in a cemetery. And in any event, the sheer breadth of the 15 listed purposes, which share no meaningful common attribute, makes it impossible to extrapolate from a few of them some limit on the "any" that modifies "purpose" in the regulation. *See Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 461–62 (2022) (explaining limits of *ejusdem generis* canon).

In sum, we agree with the Tribe that the ordinary meaning of "holdings or collections" encompasses the Native American remains at issue here, and that statutory context and the relevant regulatory definition are consistent with that reading. As a matter of text, the Tribe's complaint states a claim for repatriation under § 3005(a)(4) even if that provision applies only to human remains that are part of "holdings or collections."

**B.**

To defend its narrower reading of the statute, the government falls back on legislative history and statutory purpose. First, the government leans on legislative history materials to argue that the term "holdings or collections" was intended to cover only

17

museum collections and the like, and not cemeteries.  According to the government – and the district court agreed – the Congress that enacted NAGPRA trained its attention on "Native American human remains and funerary objects" held in "museum collections." *Winnebago Tribe*, 2024 WL 3884194, at \*2 (quoting 136 Cong. Rec. S17173–02 (daily ed. Oct. 26, 1990), 1990 WL 165443, at S17173 (statement of Sen. John McCain)).  And to prove it, the government offers a "quantitative analysis" of NAGPRA's legislative history, counting "a total of 2,009 references to 'museums,'" but only "172 references to 'cemeteries' and 'graveyards.'"  Federal Appellees' Response Brief at 41.

We may put to one side questions about the soundness of this unusual methodology. Even assuming that a word-count of legislative history could in some cases shed appreciable light on the meaning of a statutory term, it does not do so here.  It does seem, as the district court noted, that a primary focus, if not *the* primary focus, of the Congress that enacted NAGPRA was "the difficult issue of the repatriation of Native American human remains and funerary objects from museum collections to Indian tribes." *Winnebago Tribe*, 2024 WL 3884194, at \*2.  But what made that issue "difficult," and led to the prominence of museum collections in congressional debates, was that museums put up the stiffest opposition to the bill that became NAGPRA and presented the thorniest challenges for Congress.[6]  The government's word-count may tell us something interesting

---

[6] Museums initially opposed NAGPRA because they feared it would dispossess them of remains and other historical objects critical to their educational and scientific missions.  *See* H.R. Rep. No. 101-877, at 13 (1990).  When the Senate began hearings on a potential bill in 1988, it quickly "postpone[d] further action . . . to allow the museum community and the Native American community to have an opportunity to enter into a

18

about the legislative process that led to NAGPRA. But it tells us little if anything about the meaning of the term "holdings or collections," which plainly extends beyond the museum collections featured in the legislative debates to encompass holdings of "Federal agenc[ies]." 25 U.S.C. § 3003(a).

Nor does the government's quantitative analysis capture the full purpose behind NAGPRA. When it enacted NAGPRA, Congress's imagination extended beyond museum collections. Congress sought, more expansively, to honor and protect Native American burial traditions, and to ensure that Native American remains and related objects could be buried in keeping with those traditions.[7] It did so in part through § 3005's comprehensive repatriation obligation, understanding and intending that such repatriation would help to ensure that Native American remains could "be given appropriate burials" "according to

_____

dialogue on repatriation issues." *Id.* at 10. During that time, a panel was established that issued a report with recommendations addressing the dueling interests of "respect for the human rights of Native Americans" and "the value of scientific study and education" – a compromise between museums and tribes that formed the basis of the bill that ultimately passed. *Id.*; *see also id.* at 9 (discussing the "often heated debate on the rights of the Indian versus the importance to museums of the retention of their collections and the scientific value of the items").

[7] *See, e.g.*, Deborah F. Buckman, Annotation, *Validity, Construction, and Applicability of Native American Graves Protection and Repatriation Act (25 U.S.C.A. §§ 3001–3013 and 18 U.S.C.A. § 1170)*, 173 A.L.R. Fed. 585 (2001) (describing NAGPRA's purpose as "correct[ing] past abuses to, and guarantee[ing] protection for, the human remains and cultural objects of Native American tribal culture"); 136 Cong. Rec. S17173–02 (daily ed. Oct. 26, 1990), 1990 WL 165443, at S17174 (statement of Sen. Daniel Inouye) (Senate sponsor explaining that NAGPRA responded to a historical legacy in which "[t]he desires of Indians to bury their dead were ignored" and that, "[i]n light of the important role that death and burial rites play in native American cultures, it is all the more offensive that the civil rights of America's first citizens have been so flagrantly violated for the past century").

19

tribal religious practices." S. Rep. No. 101-473, at 2. Applying "holdings or collections" to Edward's and Samuel's remains so that they can be repatriated for a proper burial is as consistent with that congressional purpose as it is with the term's ordinary meaning, which covers items held underground as well as items held in a museum display case.

That brings us to the government's second argument from statutory purpose, echoed by the district court: Requiring repatriation of still-buried remains would "invert a statute designed to respond to the illegal excavation of graves on tribal and Federal lands." *Winnebago Tribe*, 2024 WL 3884194, at *3. It makes no sense, the government reasons, to read "holdings or collections" in a way that would *require* the very exhumation and desecration of Native American remains that NAGPRA is intended to prevent. We do not doubt the premise here – that mandated exhumation of properly buried Native American remains would be at cross-purposes with NAGPRA's overarching intent. But we disagree with the government because our interpretation of "holdings or collections" yields no such result.

The government and the district court rely on the Third Circuit's decision in *Thorpe*, a case in which some of the descendants of famous athlete and Native American Jim Thorpe objected to his decades-old burial by his wife at a Pennsylvania cemetery, and sought repatriation of his remains under NAGPRA. *Thorpe*, 770 F.3d at 257–58. *Thorpe* turned on whether Mr. Thorpe's gravesite qualified as a "museum" under NAGPRA, *id.* at 262–63; *see* 25 U.S.C. § 3001(8) (defining "museum"), and thus presented a legal question different from the one we confront. But the district court found its reasoning instructive, *see Winnebago Tribe*, 2024 WL 3884194, at *3, and the government urges us to adopt that

20

reasoning here:   Although the plain text of NAGPRA's broad definition of "museum" seemed to apply to Thorpe's gravesite, the Third Circuit rejected that "literal" reading because it would require exhumation of Native American remains "buried in accordance with the wishes of the decedent's next-of-kin" – a "patently absurd" result "demonstrably at odds" with the intent of NAGPRA's drafters. *Thorpe*, 770 F.3d at 257, 264.

This case is not *Thorpe*.  Unlike Mr. Thorpe, Edward and Samuel were not buried by family members and are not interred in gravesites their families "intended as [their] final resting place[s]." *Id.* at 264.  Instead, as alleged, they were forcibly separated from their families; sent to a government school in which they died from abuse and neglect; buried along with other victims in a cemetery without their families' knowledge, let alone consent; and then "haphazardly" exhumed and reburied under misspelled grave markers to make way for a parking lot.  It does a disservice to the Congress that enacted NAGPRA to suggest that the Act's purpose would be vindicated by leaving this tragic injustice unremedied.  On the contrary, it is the repatriation of Samuel's and Edward's remains so that they may be buried consistent with tribal tradition that would honor Congress's intent to address the "desires of Indians to bury their dead," for too long "ignored."  136 Cong. Rec. S17173–02 (daily ed. Oct. 26, 1990), 1990 WL 165443, at S17174 (statement of Sen. Daniel Inouye).

To the extent the district court was concerned that applying "holdings or collections" to buried remains could compel disinterment even of graves "created according to the decedent's wishes or tribal custom," *Winnebago Tribe*, 2024 WL 3884194, at *2, it need not have been.  Department of the Interior regulations exempt from

21

NAGPRA's repatriation obligations "human remains to which a museum or Federal agency can prove it has a right of possession." 43 C.F.R. § 10.2. And NAGPRA itself, as we noted at the start, defines "right of possession" as "possession obtained with the voluntary consent of an individual or group that had authority of alienation" – for human remains, "the next of kin or the official governing body of the appropriate culturally affiliated Indian tribe or Native Hawaiian organization." 25 U.S.C. § 3001(13). Federal agencies like the Army may therefore refuse repatriation of remains buried with the proper consent of a decedent's next-of-kin (as in *Thorpe*) or tribe. [8]

The *Thorpe* court raised questions about whether a "right of possession" would be sufficient to excuse a museum from repatriation of consensually buried human remains, given that § 3005's right-of-possession provision "by its terms does not apply to human remains." 770 F.3d at 264 n.16; *see* 25 U.S.C. § 3005(c). But the Department of the Interior's 2023 regulation, promulgated years after *Thorpe* was decided, has squarely resolved the matter, and we do not understand the government to challenge its own

---

[8] NAGPRA's "right of possession" applies to human remains and funerary objects "excavated, exhumed, or otherwise obtained" with consent. 25 U.S.C. § 3001(13). Applying the *ejusdem generis* canon, the dissent reasons that the right of possession is limited to remains or objects "obtained" in a manner similar to excavation or exhumation – presumably, from the ground – and thus does not extend to human remains obtained for the purpose of burial. But NAGPRA makes clear that the "associated funerary objects" covered by this provision include both objects interred with remains and objects that were never buried, 25 U.S.C. § 3001(3), and the dissent's reading would have Congress, for no apparent reason, excluding from the "right of possession" that latter set of funerary objects – those "obtained" from above ground and without an excavation, exhumation, or the like. We see no ambiguity in the plain meaning of the phrase "or otherwise obtained" in this context, and hence no need to resort to a canon that would produce anomalous results. *See Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980).

22

regulation as *ultra vires*.[9]  As a practical matter, there is simply no need to depart from the ordinary meaning of "holdings or collections" to carve out consensually interred remains that are *already* excepted from mandatory repatriation.

## C.

As we read the statutory scheme, then, the term "holdings or collections" as used in § 3003, consistent with both plain meaning and statutory context, refers to accumulations of property or other objects purposefully gathered.  That matches the regulatory definition of the term:  "an accumulation of one or more objects, items, or human remains for any temporary or permanent purpose[.]"  43 C.F.R. § 10.2.  Assuming, as we do for purposes of this case, that only items falling within "holdings or collections" are covered by § 3005's repatriation requirement, then an agency or museum must repatriate all human remains

---

[9] Nor do we suggest that any such challenge would be successful.  Although the 2023 regulation brings new clarity to this matter, it is consistent with the first Department of the Interior regulation promulgated under NAGPRA.  *See* Native American Graves Protection and Repatriation Act Regulations, 60 Fed. Reg. 62134, 62159 (Dec. 4, 1995) (defining human remains to exclude those "freely given").  And while we do not defer automatically to agency interpretations of statutes, we do take particular note of agency interpretations "issued roughly contemporaneously with enactment of the statute" that have "remained consistent over time."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024).  NAGPRA's legislative history is to the same effect.  *See, e.g.*, S. Rep. No. 101-473, at 8 (explaining that museums with a right of possession may refuse to return Native American human remains).  And it is hard to see why Congress would have exempted from repatriation consensually obtained objects but not consensually obtained human remains – including the already-excavated remains that were of such concern to museums during the debate over the Act.  Indeed, *that* absurd result – not the uncontroversial result sought in this case, the repatriation of remains buried *without* consent, which the Army has already facilitated under Army Regulation 290-5 for tribes that can identify the closest living relative of the deceased – is the result we should construe the statutory scheme to avoid.  *See supra* note 2; *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

accumulated for any purpose upon request by a tribe that can prove cultural affiliation with those remains, unless the agency or museum has a "right of possession" over the remains.

The Tribe's complaint sufficiently alleges that the remains of Samuel and Edward are part of a "holding or collection" and thus subject to repatriation. As alleged, both boys were interred at the Carlisle School's burial ground without their families' or tribe's consent. Their remains were then moved to the Carlisle Cemetery, again without consent, where their remains are marked, along with those of other Native American children who died at the Carlisle School, with headstones. Those allegations, taken as true, suffice to establish that the boys' remains are part of "an accumulation of one or more objects, items, or human remains for any temporary or permanent purpose." 43 C.F.R. § 10.2.[10] And the complaint is equally clear that the Army does not have a right of possession over those remains; as alleged, the Army never even notified either of the families that their children had died, much less obtained consent for a burial. Thus, the Tribe's complaint states a claim for repatriation of Samuel's and Edward's remains under NAGPRA.

At the end of the day, the U.S. government kept and buried the remains of two Native American schoolchildren, Samuel Gilbert and Edward Hensley, without their

---

[10] The Tribe also argues that even under the government's preferred definition, requiring a *specific* purpose consistent with "study, comparison, or exhibition," its allegations are sufficient to bring Samuel's and Edward's remains within the meaning of "holdings or collections." That is because, the Tribe says, of the particular *way* in which the Army holds and uses the remains of the Carlisle School's Native American students: describing them on plaques, referring to them on an Army website explaining the cemetery's history, and discussing them on public tours of the base. Because we have not adopted the government's narrow interpretation of "holdings or collections," we need not decide whether these allegations would satisfy it.

families' or tribe's consent after forcing them from their homes and after they died in the government's care. Nearly a century later, Congress passed a statute that, by its terms, entitles their tribe finally to bring their remains home and to bury them according to their tribal and religious traditions. Nothing in the statute's text or purpose forecloses that outcome. Quite the opposite: All signs indicate that the Tribe's repatriation request is precisely the kind of remedy of historic wrongs that NAGPRA was designed to facilitate.

Our decision today does not open the floodgates to disinterment of consensually buried Native Americans. Nor does it require agencies or museums to find and inventory remains they never knew they possessed. It holds only that Native American human remains purposefully held by a federal agency or federally funded museum without the requisite familial or tribal consent must be inventoried and, upon a qualifying descendant's or tribe's request, repatriated pursuant to NAGPRA.

## III.

For the foregoing reasons, we vacate the district court's dismissal of the Tribe's complaint and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

25

RUSHING, Circuit Judge, dissenting:

This case presents a novel question of statutory interpretation: Does the Native American Graves Protection and Repatriation Act require the federal government to dig up the graves of deceased Native Americans buried in federal cemeteries? The majority says yes. I disagree.

## I.

During the late nineteenth century and into the twentieth, museum collectors and the federal government engaged in widespread desecration of Indian graves, unearthing the remains of deceased Native Americans and objects buried with them for purposes of scientific study, museum exhibition, and indefinite storage. *See Thorpe v. Borough of Thorpe*, 770 F.3d 255, 260 (3d Cir. 2014). This "looting and plundering of Native American burial grounds and the theft of cultural artifacts from Native American tribes . . . continued to pour salt into the many wounds that have been inflicted on Native Americans throughout the history of the United States." *Id.*

Congress responded swiftly after learning from the Secretary of the Smithsonian that "of the 34,000 remains in the Institution's collection, approximately 42.5% of the specimens were the remains of North American Indians." *Id.* The 101st Congress provided for the return of Native American human remains and associated funeral objects in the "possession or control of the Smithsonian Institution" and created a procedure for their inventory, identification, and repatriation. National Museum of the American Indian Act, Pub. L. 101-185 §§ 11, 12, 103 Stat. 1336, 1343 (1989) (codified at 20 U.S.C. § 80q *et seq.*).

26

But Congress wanted to go further than just the Smithsonian. After consulting with tribes and other stakeholders in the scientific and museum community, the same Congress later passed the Native American Graves Protection and Repatriation Act (NAGPRA) to provide for similar redress beyond the Smithsonian in a law "modeled after" the first one. *Thorpe*, 770 F.3d at 261; *see* NAGPRA, Pub. L. 101-601, 104 Stat. 3048 (1990) (codified at 25 U.S.C. § 3001 *et seq.*, 18 U.S.C. § 1170). The Act covers "Federal agenc[ies]"—defined as "any department, agency, or instrumentality of the United States" other than "the Smithsonian Institution"—and "museum[s]"—defined as "any institution or State or local government agency (including any institution of higher learning) that receives Federal funds and has possession of, or control over, Native American cultural items." NAGPRA § 2(4), (8). Under the statute, "cultural items" include "human remains," associated and unassociated funerary objects, sacred objects, and objects of cultural patrimony. *Id.* § 2(3).

As its name suggests, the Native American Graves Protection and Repatriation Act aims at two central purposes: graves protection and repatriation. Both are important to this case.

## A.

The "graves protection" part of the Act applies to Native American human remains and objects on "Federal or tribal lands" as of "the date of [NAGPRA's] enactment." *Id.* § 3(a), (c), (d).

The "intentional removal . . . or excavation of Native American cultural items," which include human remains and objects, from "Federal or tribal lands for purposes of discovery, study, or removal of such items" is unlawful unless certain criteria are met. *Id.*

27

§ 3(c). Those criteria include tribal consultation and proof thereof, appropriate disposition of the removed items, and acquisition of a "permit issued under section 4 of the Archaeological Resources Protection Act of 1979." *Id.* § 3(c)(1)–(4) (citing Pub. L. 96-95, 93 Stat. 721 (1979) (codified at 16 U.S.C. § 470aa *et seq.*)).

As for the "inadvertent discovery" of such items, "[a]ny person who knows, or has reason to know" that he or she has "discovered Native American cultural items on Federal . . . lands" after the enactment of NAGPRA must notify the federal official with management authority over those lands. *Id.* § 3(d)(1). And "[i]f the discovery occurred in connection with an activity," like construction or mining, for example, the person must "cease the activity in the area of the discovery[ and] make a reasonable effort to protect the items discovered." *Id.*

The Act provides detailed rules for the disposition of cultural items "excavated or discovered" on federal lands "after the date of enactment." *Id.* § 3(a). For human remains, priority goes to "the lineal descendants of the Native American" and then to "the Indian tribe . . . which has the closest cultural affiliation with such remains" or, if the cultural affiliation cannot be reasonably ascertained, the tribe that "aboriginally occup[ied] the area" where the remains were discovered, unless "a different tribe has a stronger cultural relationship with the remains." *Id.*

B.

The "repatriation" part of the Act provides for the inventory and return of human remains and other cultural items in holdings and collections of federal agencies and federally funded museums. *See id.* §§ 5, 6, 7.

28

The inventory provision requires agencies and museums which have "possession or control over holdings or collections of Native American human remains and associated funerary objects" to compile an itemized list of such remains or objects and, "to the extent possible based on information possessed by such museum or Federal agency, identify the geographical and cultural affiliation of such item." *Id.* § 5(a), (e). The inventories and identifications must be made available to a review committee, conducted in consultation with the tribes and, unless an extension was obtained, had to be completed within five years of NAGPRA's enactment. *Id.* § 5(b), (c). There is also a slightly less onerous inventory requirement for other categories of cultural items. *See id.* § 6 ("summary for unassociated funerary objects, sacred objects, and cultural patrimony").

Repatriation procedures differ depending on how the remains or objects are identified. For those whose cultural affiliation is identified on an inventory, the agency or museum will have provided notice to the tribe and must "expeditiously return" such remains and objects "upon the request of a known lineal descendant of the Native American or of the tribe." *Id.* § 7(a)(1), (2); *see id.* § 5(d). Where the cultural affiliation of human remains and funerary objects has not been established in an inventory or those items "are not included upon any such inventory," the agency or museum must "expeditiously return[]" them when the requesting tribe shows "cultural affiliation by a preponderance of the evidence." *Id.* § 7(a)(4). The Act also sets standards for the return of other categories of cultural items when an agency or museum has not ascertained the item's cultural affiliation. *See id.* § 7(a)(5) (pertaining to "sacred objects and objects of cultural patrimony").

29

Only in narrow circumstances may an agency or museum refuse to repatriate an item upon request of a lineal descendant or tribe. NAGPRA recognizes a "right of possession" exception, which applies when an agency or museum can prove that it obtained the items in question "with the voluntary consent of an individual or group that had authority of alienation." *Id.* §§ 2(13), 7(c). "Right of possession" is a defense against repatriation for "unassociated funerary objects, sacred objects or objects of cultural patrimony." *Id.* § 7(c). But it is not a defense to the repatriation of human remains and associated funerary objects. *See id.* The only exception to the repatriation of human remains and associated funerary objects is for "scientific study," which allows a temporary delay in repatriation when "such items are indispensable for completion of a specific scientific study, the outcome of which would be of major benefit to the United States." *Id.* § 7(b).

As applied to human remains, the right of possession is relevant only as a defense to criminal liability. Under NAGPRA's criminal provision, anyone who "knowingly sells, purchases, uses for profit, or transports for sale or profit" "the human remains of a Native American without the right of possession to those remains" or "any Native American cultural items obtained in violation of" the Act is subject to a fine and prison time. *Id.* § 4 (codified as amended at 18 U.S.C. § 1170). A right of possession to Native American human remains attaches only for "[t]he original acquisition" of remains "which were excavated, exhumed, or otherwise obtained with full knowledge and consent of the next of kin or the official governing body of the appropriate culturally affiliated Indian tribe." *Id.* § 2(13).

30

No provision of NAGPRA directs the federal government to disinter buried human remains. At the same time, the Act does not limit any agency's authority to "return or repatriate Native American cultural items," including human remains, "to Indian tribes." *Id.* § 11(1)(A).

## II.

The Winnebago Tribe of Nebraska wants the United States Army to return to the tribe the mortal remains of two Winnebago boys, Edward and Samuel, who died at the Carlisle Indian Industrial School and were buried at the Carlisle Indian Cemetery on Army property in Pennsylvania.[1] Edward and Samuel were buried on federal land before Congress passed NAGPRA and they remain buried there today. Under NAGPRA, then, their graves are protected from excavation. So how does the majority conclude that NAGPRA requires the Army to exhume their bodies? It does so by interpreting "holdings or collections" to include all graveyards on federal land. The statute's language and structure refute that interpretation.

## A.

The majority's primary holding is that cemeteries are "holdings or collections" of human remains subject to NAGPRA's inventory and repatriation requirements. I disagree.

---

[1] The Army has offered to disinter and return both boys pursuant to the procedures of Army Regulation 290-5. At least 32 other Carlisle students have been repatriated through that process. According to the complaint, however, the Winnebago Tribe finds that process insufficient and wants repatriation through NAGPRA.

31

A collection is an "accumulation of objects gathered for study, comparison, or exhibition." Maj. Op. 13 (quoting *Collection*, 3 Oxford English Dictionary 478 (2d ed. 1989); Webster's Ninth New Collegiate Dictionary 259 (1988)). "Holding" has many broad definitions, but the plural "holdings" indicates "any property that is owned or possessed."[2] Webster's Third New International Dictionary 1079 (1986); *see also* Black's Law Dictionary 731 (6th ed. 1990) ("general term for property . . . owned by a person or corporation"). Perhaps most relevant for a statute like this one addressing museums and institutions of higher education, "holdings" means "the entire *collection* of books, periodicals, and other materials in a library." Random House Dictionary of the English Language 911 (2d ed. 1987) (emphasis added); Webster's Third New International Dictionary 1079 (1986) (providing usage example of "the [holding]s of American libraries").

The majority correctly discerns that, in the context of NAGPRA's inventory provision, "holdings or collections" must refer to "something intentionally or purposefully

---

[2] Of course, the common law has long recognized that human remains are not property that can be owned by another person, although the living may have rights of control and disposition over them. *See* 2 William Blackstone, Commentaries *429 ("[T]hough the heir has a property in the monuments and escutcheons of his ancestors, yet he had none in their bodies or ashes."); *Pettigrew v. Pettigrew*, 56 A. 878, 879 (Pa. 1904) ("It is commonly said, being repeated from the early cases in England, where the whole matter of burials was under the jurisdiction of the ecclesiastical courts, that there can be no property in a corpse."). NAGPRA itself carefully observes this distinction. For example, the Act consistently refers to "ownership *or control of* Native American cultural items," which term includes both human remains and objects. NAGPRA § 3(a) (emphasis added). And the Act recognizes that tribes may "relinquish[] *control* over any Native American human remains, or *title to* or control over any funerary object." *Id.* §§ 2(3), 3(e) (emphasis added).

accumulated," not merely something in the agency's possession or control. Maj. Op. 13; *see* NAGPRA § 5(a). A distinguishing feature of "holdings or collections," then, is the purpose for which the items were gathered together—a purpose like "study, comparison, or exhibition." *Collection*, 3 Oxford English Dictionary 478 (2d ed. 1989); Webster's Ninth New Collegiate Dictionary 259 (1988).

As a linguistic matter, therefore, the district court was correct that a cemetery does not fit within a natural reading of the phrase "holdings or collections of Native American human remains." NAGPRA § 5(a); *see Winnebago Tribe of Neb. v. Dep't of the Army*, No. 1:24-cv-00078, 2024 WL 3884194, at *2 (E.D. Va. Aug. 20, 2024) ("Both terms apply naturally to a museum or federal agency's inventory of previously excavated remains; neither term applies naturally to graves in a cemetery."). A cemetery is not an accumulation of human remains gathered for study, comparison, or exhibition.[3] The bodies of Edward and Samuel were not buried at Carlisle Cemetery as an archive or to be stored for future examination, like a museum might do. Rather, to the extent that the mortal remains of the deceased were intentionally gathered at all, they were gathered for burial in the cemetery for the purpose of giving them a place of final rest. As the only other court of appeals to address this statutory language has reasoned, NAGPRA's text implies "that a museum is holding or collecting the remains for the purposes of display or study, as

---

[3] The Winnebago Tribe's alternative argument that the remains of Samuel and Edward are exhibited because the Carlisle Cemetery is a stop on the Army War College tour and features a plaque acknowledging that Carlisle students are buried there is unavailing because it is the land and the plaque that are exhibited, not any human remains.

33

opposed to serving as an original burial site."[4]    *Thorpe*, 770 F.3d at 266.    This commonsense conclusion flows from the ordinary meaning of the relevant statutory terms.

The majority faults the district court for drawing a "location-specific" distinction regarding the meaning of "holdings or collections" because the court found that excavated human remains in a museum exhibit are covered but remains interred in a cemetery are not. Maj. Op. 14–15.  That is not the distinction the district court made.  Rather, its conclusion that a cemetery is not a "collection" of human remains was a *purpose* distinction, not a locational one.  To take the majority's example, an assortment of coins that a person sweeps up and dumps in his landfill on the back forty is not a "collection" of coins, whereas the same assortment of coins placed in protective sleeves and stored on the shelf is.  *See* Maj. Op. 15.  The location of the items affects whether they are a "collection" only to the extent that it reflects the purpose for their accumulation.  While the person who throws away the

---

[4] That case concerned the final repose of legendary athlete Jim Thorpe, himself a Carlisle School alumnus.  Thorpe's father sent him to Carlisle when he was 16 years old, and there Thorpe became a college football all-American under famed coach Glenn "Pop" Warner.  *See Jim Thorpe*, Pro Football Hall of Fame, https://www.profootballhof.com/players/jim-thorpe [https://perma.cc/856K-9Q9E]; Rusty Glessner, *Visiting the Jim Thorpe Memorial in Carbon County*, PA Bucket List, https://pabucketlist.com/visiting-the-jim-thorpe-memorial-in-carbon-county/ [https://perma.cc/M3M7-8EG2].    After Carlisle, Thorpe won two Olympic gold medals (in decathlon and pentathlon) before playing professional baseball and professional football, eventually becoming the first president of the National Football League.

After his death, Thorpe's widow arranged for him to be buried at a memorial park dedicated to his legacy in the Borough of Thorpe, Pennsylvania, which renamed itself in his honor.  Thorpe's children sued, seeking to have his remains repatriated to Oklahoma under NAGPRA.  The Third Circuit rejected their argument as "clearly absurd" and "contrary to Congress's intent to protect Native American burial sites." *Thorpe*, 770 F.3d at 266.

34

coins "intentionally and affirmatively" gathered them for the purpose of tossing them out, Maj. Op. 14, that is not the kind of purpose that can turn the wayward coins into a "collection."

Rather than limiting "holdings or collections" to their definitional purposes like study, comparison, and exhibition, the majority expands the phrase so far as to conclude that "obtain[ing]" items for "*any* purpose will do—including the laying to rest of human remains in a cemetery" with the intent that they never again be disturbed. Maj. Op. 16. In other words, the majority finds that Carlisle Cemetery is the Army's "human remains collection" because the departed were "intentionally or purposefully accumulated" there for burial in a final resting place. Maj. Op. 13. The same reasoning necessarily applies to Arlington National Cemetery and every other graveyard. Even putting aside "insensitiv[ity]," Maj. Op. 13 n.3, it is simply not natural English to refer to a cemetery as the landowner's "corpse collection." The purpose of burying human remains in a cemetery is to lay them to rest; that is not a purpose of a collector and so does not qualify cemeteries as "holdings or collections" subject to NAGPRA's inventory and repatriation provisions.

In addition to the plain meaning of the text, NAGPRA's statutory context also demonstrates that the majority's broad interpretation of "holdings or collections" to include buried human remains is incorrect. The Act differentiates between "holdings or collections" of exhumed remains and objects on the one hand and remains still buried in graves on the other. In Section 3, NAGPRA imposes a detailed set of obligations and rules to protect graves and to govern the treatment and control of Native American human remains "excavated or discovered" on federal lands after the Act's enactment. NAGPRA

35

§ 3. In Sections 5 and 7, the statute imposes a different set of obligations to inventory and repatriate Native American human remains and funerary objects that have previously been exhumed and exist in museum or agency holdings or collections. *Id.* §§ 5, 7.

The different words Congress used to refer to these two categories of human remains is instructive. When referring to interred human remains in NAGPRA, Congress spoke of "excavation" and "removal," indicating that those remains must be disinterred from their resting place before anything further can be done with them. *Id.* § 3(c); *see id.* § 3(a) ("excavated or discovered"), (c)(1) ("excavated or removed"), (c)(2) ("excavated or removed"), (d)(2) ("excavated or removed"). When Congress referred to human remains in agency or museum holdings or collections, it used verbs like "possess" and "return." *See id.* §§ 5(a), 7. Not once does NAGPRA use "possess" or "return" in the context of an agency's relationship to buried remains. Rather, the remains must be "excavated," "exhumed," or "removed" from their resting place in order to be "possess[ed]" or returned. *Id.* §§ 2(13), 3; *see Thorpe*, 770 F.3d at 266 ("NAGPRA requires that remains be 'returned.' This assumes that the human remains were moved from their intended final resting place." (citation omitted)). Conversely, nothing in the inventory or repatriation provisions refers to "removal" or "excavation" of human remains in holdings or collections—the words are not used. NAGPRA §§ 5, 6, 7. But if buried remains were included in "holdings or collections," excavation would be a necessary step toward fulfilling the agency's or museum's obligations.

Indeed, nothing anywhere in the Act mentions an obligation to excavate or remove buried human remains under any circumstance. Just the opposite. The Act requires that

36

buried remains stay undisturbed unless and until detailed prerequisites are satisfied. *See id.* § 3(c), (d).  NAGPRA's differing treatment of graves versus "holdings or collections" demonstrates that the latter is not so broad as to accommodate the majority's characterization of cemeteries as collections of human remains that an agency or museum has chosen to store "underground" rather than in a "display case."[5]  Maj. Op. 20.

### B.

Under the majority's interpretation of "holdings or collections," Native American graves in federal cemeteries are uniquely vulnerable to disturbance.  The majority attempts to cabin the effects of its construction by asserting that NAGPRA gives the federal government a "right of possession" to human remains voluntarily buried on federal land, with the result that federal agencies may "refuse repatriation of remains buried with the proper consent of a decedent's next-of-kin . . . or tribe."  Maj. Op. 21–22.  That argument only further demonstrates the error of the majority's construction, in two ways.

First, Congress did not make "right of possession" a defense against repatriation of human remains.  Indeed, NAGPRA's repatriation provision is carefully crafted to avoid doing so.  The "right of possession" exception to repatriation is located in Section 7(c).  It specifies that when a descendant or tribe requests the return of "unassociated funerary

---

[5] The majority invokes the regulatory definition of "holding or collection" as an accumulation of items for "any" purpose, followed by fifteen specific examples. 43 C.F.R. § 10.2.  To the extent that regulation could be interpreted to include the purpose of burying human remains in their final resting place, it would be inconsistent with NAGPRA. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024) (holding that the proper interpretation of a statute is "the reading the court would have reached if no agency were involved" (internal quotation marks omitted)).

objects, sacred objects or objects of cultural patrimony," the agency or museum shall return the objects unless it can "prove that it has a right of possession to the objects." NAGPRA § 7(c). That list notably does not include human remains or the term "cultural items," which includes human remains among other things. *See Thorpe*, 770 F.3d at 264 n.16 (observing that Section 7(c) "by its terms does not apply to human remains").

The manner in which Section 7(c) interacts with the rest of the repatriation provision makes Congress's intent unmistakable. That provision specifies that unassociated funerary objects, sacred objects, and objects of cultural patrimony must be returned upon request "and pursuant to subsections (b) [the scientific study exception], (c) [the right of possession exception], and (e) [about requestors' competing claims]." NAGPRA § 7(a)(2), (a)(5). By contrast, "human remains and associated funerary objects" must be returned upon request "and pursuant to subsections (b) [the scientific study exception] and (e) [about requestors' competing claims]." *Id.* § 7(a)(1), (a)(4). The two provisions requiring repatriation of human remains conspicuously omit the right of possession exception in subsection (c), making clear that exception does not apply to human remains. Indeed, the phrasing of subsection (a)(4) makes the contrast particularly plain: "Native American human remains and funerary objects" must be returned "upon request and pursuant to subsections (b) and (e), and, in the case of unassociated funerary objects, subsection (c)." *Id.* § 7(a)(4).

Ignoring the statute's specificity, the majority relies instead on a Department of the Interior regulation that "exempt[s] from NAGPRA's repatriation obligations 'human remains to which a museum or Federal agency can prove it has a right of possession.'" Maj. Op. 21–22 (quoting 43 C.F.R. § 10.2). The regulation, however, patently rewrites the

38

statute to extend the right of possession exception to human remains when Congress clearly

chose not to do so.  The agency has no authority to overrule Congress's determination that

*all* Native American human remains in holdings or collections should be repatriated upon

request, subject only to the possibility of delay caused by the scientific study exception.

*See* NAGPRA § 13 (authorizing the Secretary of the Interior to promulgate only

"regulations to *carry out* this Act," not to amend it (emphasis added)).

Nor is there anything "absurd" about treating human bodies with more respect than

objects.  Maj. Op. 22 n.9.  Congress could, and did, quite rationally decide that human

remains in holdings or collections should not be shielded from repatriation no matter how

an agency or museum came to possess those remains.  While a museum can insist upon its

right to own or possess an object—and its right to compensation if the government takes

its property—Congress rationally determined that a museum or agency cannot assert a

superior right to possess the body of a human being.[6]  *See* NAGPRA § 2(13) (defining the

---

[6] Another clue that the majority is trying to fit a square peg in a round hole comes from NAGPRA's description of the circumstances that create a right of possession to human remains.  Under the Act, "[t]he original acquisition of Native American human remains . . . which were excavated, exhumed, or otherwise obtained with full knowledge and consent of the next of kin or the official [tribal] governing body . . . is deemed to give right of possession to those remains."  NAGPRA § 2(13).  Under the majority's interpretation, "otherwise obtained" must be construed to include "obtained for burial."  But that meaning is an odd fit with the preceding words in the list—"excavated" and exhumed"—which refer to the exact opposite of burial.  *See Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1789 (2022) (explaining that the *ejusdem generis* canon "instructs courts to interpret a general or collective term at the end of a list of specific items in light of any common attributes shared by the specific items" (internal quotation marks and brackets omitted)); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–115 (2001) (explaining that *ejusdem generis* appropriately applies when interpreting a residual phrase broadly would "fail[] to give independent effect to the statute's enumeration of the specific" items

"right of possession" for items *other than* human remains to include an exception for circumstances when the phrase "so defined would, as applied in section 7(c), result in a Fifth Amendment taking by the United States").

Second, NAGPRA makes the right of possession a defense to its criminal trafficking provision. *See id.* § 4(a) ("Whoever knowingly sells, purchases, uses for profit, or transports for sale or profit, the human remains of a Native American *without the right of possession* to those remains . . . shall be fined in accordance with this title, or imprisoned . . . ." (emphasis added)). In fact, the criminal provision is the only instance where the Act applies the right of possession to human remains. Pursuant to that provision, an individual or entity with the right of possession can sell and use Native American human remains without criminal liability. Under the majority's reasoning, then, Native American families—and only Native American families—who consent to have their deceased

---

preceding the residual phrase in the list). That is yet another indication that the right of possession does not apply to interred human remains.

 In response to this concern, the majority notes that this provision also applies to "associated funerary objects," which are "objects that, as a part of the death rite or ceremony of a culture, are reasonably believed to have been placed with individual human remains either at the time of death or later." NAGPRA § 2(3)(A); *see* Maj. Op. 22 n.8. The phrase "excavated, exhumed, or otherwise obtained" applies to these objects just as it does to human remains, because these objects are removed from a "burial site," which is any place "below, on, or above the surface of the earth," into which "individual human remains are deposited" as part of a "death rite or ceremony of a culture." NAGPRA § 2(1). Contrary to the majority's assertion, the statutory text does not produce "anomalous results" when read according to this basic principle of sound interpretation. Maj. Op. 22 n.8; *cf.* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 199 (2012) (classifying *ejusdem generis* as a contextual canon which "parallels common usage" of the English language).

relatives buried at Arlington or other qualifying cemeteries are giving the federal government the right of possession to their loved ones' remains. And with the right of possession comes the right to disinter those remains and sell them to a private collector, display them in the Smithsonian, or add them to the archives indefinitely. *That* reversal of NAGPRA is the absurd result.

"Right of possession" doesn't narrow or salvage the majority's interpretation of NAGPRA's repatriation provision; rather, it is another sign that the majority's construction is not what Congress meant.

### III.

No party disputes that the bodies of these two Winnebago boys should be returned, they merely dispute how. But there is a wide gulf between finding that "[n]othing in [NAGPRA's] text or purpose forecloses" the return of Edward and Samuel's remains, Maj. Op. 25—which is correct, *see* NAGPRA § 11(1)(A)—and concluding that, under penalty of law, *see id.* § 9, the statute places affirmative legal obligations on all qualifying cemeteries to inventory, exhume, and return the buried dead there laid to rest.

Because the graves of deceased Native Americans buried in federal cemeteries are not subject to NAGPRA's inventory and repatriation provisions, I would affirm the district court's judgment dismissing the Winnebago Tribe's complaint. I respectfully dissent.

41